

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| RUSSELL E. BLANKENSHIP, ) | CIVIL ACTION NO. 9:09-1332-MBS-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), alleging disability as of June 1, 2002[1] due to a broken femur and ribs, back and leg impairments, Hepatitis C, and mental problems. (R.pp. 70-72, 112, 1013, 1019). Plaintiff's claims were denied initially and upon reconsideration. Plaintiff then requested a hearing before an

---

[1] As a result of a previous claim, Plaintiff was found not to be disabled through May 31, 2002. (See R.pp. 54, 1013, 1019). The ALJ in the current claim declined to reopen that decision; see R.p. 30; and Plaintiff does not allege in his current applications that he was disabled prior to June 1, 2002.

Administrative Law Judge (ALJ), which was held on November 1, 2006. (R.pp. 1017-1052).[2] The ALJ thereafter issued a decision dated February 23, 2007 finding that Plaintiff was disabled as of November 4, 2003, but was not disabled prior to that date. (R.pp. 25-37). Because Plaintiff's eligibility for DIB expired on March 31, 2003,[3] he was only awarded SSI. (R.p. 53).[4] The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 8-10).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for an award of benefits from June 1, 2002. The Commissioner contends that the decision to deny benefits prior to July 2004[5] is supported by substantial evidence, and that Plaintiff was properly found not to be disabled prior to November 4, 2003.

---

[2]The hearing had originally been scheduled for July 14, 2006, but was continued. (R.pp. 1011-1016).

[3]Plaintiff does not dispute that his eligibility for DIB expired on March 31, 2003. For purposes of DIB eligibility, a claimant must show that he or she became disabled prior to the expiration of his or her insured status. See 42 U.S.C. § 423(c); 20 C.F.R. § 404.101 (2009).

[4]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that she was disabled during the insured period for DIB may still receive SSI benefits if she can establish that she is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].

[5]Under SSI, the claimant's entitlement to benefits (assuming they establish disability) begins the month following the date of filing the application forward. Pariseau v. Astrue, No. 07-268, 2008 WL 2414851, * 13 (D.R.I. June 13, 2008); see 20 C.F.R. § § 416.202(g), 416.203(b), 416.335 (2009). Hence, although Plaintiff was found to be disabled as of November 4, 2003, since Plaintiff filed his current SSI application in June 2004, the earliest month for which he could receive SSI was July 2004.

2



**Scope of review**

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

**Discussion**

A review of the record shows that Plaintiff, who was forty-three (43) years old when he alleges his disability began, has a high school education with some additional vocational training, with past relevant work as a pipe fitter/welder. (R.pp. 119, 1022, 1024, 1028, 1043). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial



3

gainful activity for which he is qualified by his age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff suffers from the severe impairments[6] of Hepatitis C, a mood disorder, and musculoskeletal impairments of the back, neck, right shoulder, and right hip, rendering him unable to perform his past relevant work, he nevertheless retained the residual functional capacity (RFC) to perform a limited range of sedentary work activity[7] prior to November 4, 2003, and was therefore not disabled prior to that date. The ALJ further determined that Plaintiff was disabled as of November 4, 2003, continuing thereafter. (R.pp. 28-29, 34-37).

Plaintiff asserts that in reaching this decision, the ALJ erred by failing to accord proper weight to the opinions of Plaintiff's treating physicians concerning the extent of his pain and limitations. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds that there is substantial evidence in the record to support the conclusion of the ALJ that Plaintiff was not disabled as that term is defined in the Social Security Act prior to November 4, 2003, and that the decision of the Commissioner should therefore be affirmed.

As noted, Plaintiff had previously sought disability benefits through the Social Security program. The record reflects that, following a motor vehicle accident in 1996, Plaintiff was awarded disability benefits for the period October 9, 1996 through 1997. However, despite continued

---

[6] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[7] Sedentary work is defined as lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2005).



complaints of various medical problems, Plaintiff was found not to be disabled on a subsequent claim. (See generally, R.pp. 54, 1013, 1019). In any event, since Plaintiff does not allege that he was disabled prior to June 1, 2002, the only relevant issue is whether any conditions from which he suffered prior to that date worsened in the ten (10) month period from June 1, 2002 through March 31, 2003 (the date Plaintiff was last insured for purposes of DIB), or he acquired some new disabiling impairment during that period, to entitle him to disability benefits under DIB.

The medical records show that Plaintiff presented to the Family Practice Center on June 5, 2002 complaining that the he had fallen the previous day, causing him considerable pain on his right side. However, x-rays of Plaintiff's hip, lateral pelvis, and femur showed the rods with the screws in place in his leg,[8] and the attending physician, Dr. Tan Platt, did not see any new injury. (R.p. 492) The following day Plaintiff was seen by Dr. Richard James, who on examination found mild tenderness to palpation at the gluteus medius with internal rotation of the right hip being more severely limited than external rotation, but still with good motion. Plaintiff was able to flex with some mild discomfort, and abduction strength was 4/5 on the right and 5/5 (full) on the left. Dr. James encouraged Plaintiff to perform cardio workouts on a stationary bicycle, and told him to pursue "normal activities" with no strenuous exercises. (R.pp. 491-492).

Plaintiff was seen again on June 25, 2002 by Dr. Jeffrey Ilsley, who after consultation with Plaintiff's attending physician (Dr. Lesa Bethea) noted that Plaintiff was a possible "narcotic seeker" and that Dr. Bethea did not wish for him to have any narcotics. Plaintiff was continuing to complain of pain in his back which had gotten worse over the last couple of days, which he attributed to his recent fall. Plaintiff was using a cane to walk, but on examination Dr. Ilsley found no cervical

---

[8]Plaintiff has a rod in his right femoral shaft from his previous automobile accident. (R.p. 492).



tenderness and 3-4/5 strength secondary to effort in Plaintiff's lower extremities. Plaintiff did have some paraspinal muscle tenderness around the shoulder blades and into his lower back, with a small amount of spinal tenderness in these regions also, but much less than the paraspinus muscles. Plaintiff was given some Vioxx and Flexeril and was advised to use hot and cold compresses. (R.pp. 490-491).

Dr. James saw Plaintiff again on June 27, 2002, noting Plaintiff's complaints of chronic back pain since 1996, as well as his history of drug abuse and Hepatitis C. Plaintiff was complaining of pain of 7 on a 10 point scale, although there were also days "where he was pain free". Dr. James noted that Plaintiff has leg length discrepancy, with his right leg being shorter than the left, and on examination Plaintiff exhibited poor internal rotation of his femur on the left with some diminishment of internal rotation on the right, with rotation on his left producing some of his pain. Dr. James noted that Plaintiff's hip muscles would periodically flare up due to his condition, but found either no to minimal pain on palpation in Plaintiff's gluteal area or sciatic notch, and he was advised to continue with physical therapy and to try to use a stationary bike and treadmill. (R.p. 489).

Plaintiff returned to the Clinic on July 10, 2002 complaining of chronic pain, and was seen by Dr. Bethea. It was noted that Plaintiff was not currently undergoing any physical therapy, and that he was frequently requesting pain medications. Dr. Bethea also noted that Plaintiff claimed that he was unable to work, and that Plaintiff's "mother accompanied him as is the usual case and wants me to write a letter to disability stating that he is totally disabled, which I have not been willing to do for them in the past." Dr. Bethea noted that Plaintiff was able to walk into the Clinic, although he walked with a limp, and that he was able to sit and rise from the chair without difficulty. On examination Dr. Bethea determined that Plaintiff was able to ambulate, and she told Plaintiff and his mother that she would not be able to fill out papers for total disability. Dr. Bethea recommended that



Plaintiff start swimming at least thirty minutes to an hour daily in his pool. (R.p. 488). Plaintiff was subsequently seen by Dr. James on July 18, 2002, and was encouraged to continue with pain management strategies. Dr. James told Plaintiff that his chronic back pain would continue and probably would be a lifelong problem, and that learning how to manage his pain at a tolerable level would be his major goal. (R.p. 487)

The record reflects that Plaintiff had also been to see Dr. Daniel Westerkam on July 9, 2002 for a followup regarding traumatic brain injury (apparently as a result of his 1996 automobile accident) and chronic pain. Dr. Westerkam noted that he had seen Plaintiff "multiple times" for his complaints, but that he had not been able to help him with his pain complaints and had referred him to other physicians. Dr. Westerkam noted that Plaintiff still had the same complaints and was taking multiple medications but did not want to go to therapy, although he expressed interest in seeing an orthopedic surgeon for possible removal of some ossification which Plaintiff stated he had in his right hip. On physical examination Plaintiff was found to be in no acute distress, his extremities revealed no significant edema or erythema, increased tone was noted on the right side, with decreased range of motion of the right hip. (R.p. 247). Dr. Westerkam them completed two physicians statements of disability (apparently both dated July 10, 2002), in which he noted that Plaintiff had been injured in 1996 and that he had been "continuously total disabled" since October 26, 1996. (R.pp. 243, 245).

Plaintiff returned to see Dr. James on July 30, 2002, at which time Dr. James noted that Plaintiff had not been very good at going to work rehab, and that after one session with the chronic pain people Plaintiff felt that they had not helped him and he had "not been very compliant [with] visiting them either." Dr. James noted that he had seen the Plaintiff "multiple times for his pain" and they had given him some trigger point injections and talked about pain management strategies. Plaintiff advised Dr. James of various medical complaints, including that he was suffering

7



from diarrhea and gas, had had some intermittent left groin spasms, and that he had some skin lesions (which had been found to be benign). Dr. James reported that Plaintiff wanted him to "fill out a form that states that he is completely disabled in order for him to get food stamps", noting that he had previously had these forms "filled out by Dr. Westerkam and others". Dr. James looked at his skin lesions and gave Plaintiff some trigger point injections. (R.p. 486).

Plaintiff was seen again by Dr. James on September 12, 2002, still complaining of chronic back pain and muscular skeletal pain. Plaintiff had recently been seen by orthopedic surgeons, who had written a note regarding Plaintiff's complaints of right hip pain that he had non-operable heterotopic ossification of his greater trochanter. Dr. James noted that this did not explain Plaintiff's complaints of hip pain, and on physical examination Plaintiff had no radicular symptoms of low back pain with good range of motion, one hundred degrees of flexion of the right hip, seventy degrees of the external rotation, and twenty degrees of the internal rotation. Dr. James noted that despite Plaintiff's complaints of constant and chronic back, neck and hip pain, he had no excessive pain reactions to his examination. Dr. James also noted that Plaintiff's strength in the affected extremities was 5/5 (full), and that given Plaintiff's physical examination and x-ray findings, his "estimated impairment would be minimal". Dr. James stated that Plaintiff had "chronic depression" which was stable, had a "second to third grade reading level", and opined that that it was unknown when Plaintiff would be able to return to work since "he currently [was] not very motivated to return to work and [complains of] pain on sitting, standing, or doing anything that involved work related positions." He believed Plaintiff's work capacity was part time, although Plaintiff could probably engage in job training up to forty hours a week "and a lot of that depends on his motivation, which is poor in overcoming his second or third grade reading level. (R.pp. 484-485).

On October 11, 2002, Dr. James noted that Plaintiff was going to chronic pain



management once a week, and that he had good motor function in his upper extremities with good grip strength. Dr. James reported that Plaintiff had "no other aspirations for hobby or job", that he believed that psychotherapy would help Plaintiff with his coping strategies, and that he would try to arrange a visit with therapist. (R.pp. 482-483).

Plaintiff returned to the clinic on October 15, 2002 after he fell and struck his left "flank". Plaintiff complained of worsening lumbar pain, although no contusion was noted "at this point." Plaintiff was experiencing some muscle spasms in his paraspinous and very low lumbar areas, and was advised by Dr. James that this was "a short-termed effect, but that for long term he has got to [continue] doing some exercise." (R.pp. 481-482). Plaintiff continued to be seen at the Clinic, and on November 1, 2002 it was noted that about two weeks previous he had fallen over a dog, landing on his buttocks. Plaintiff complained that since that time he had experienced some sharp pain that was worse breathing, and that any movement made it worse. It was noted that Plaintiff was on Vioxx, and on examination appeared "chronically depressed". Plaintiff had been using a cane since his fall, but was walking with crutches when he came to the clinic, although he was able to get on and off the examination table "pretty well". On examination Plaintiff was tender to palpation along the lateral flank region on the left, over the ribs, the lateral chest wall, and mid and anterior [unintelligible] lines. Notwithstanding his breathing complaints, an x-ray that had been performed by Dr. James two days previous was normal. (R.pp. 478-479).

On November 13, 2002, Plaintiff was still using crutches, although Dr. Bethea noted that Plaintiff had not been to physical therapy. Plaintiff was going to the Chronic Pain Clinic twice a week and was also seeing a psychologist. On examination, Dr. Bethea found Plaintiff to be a "healthy middle-aged [white male] in [no distress]". Plaintiff was unable to walk very far without his crutches and appeared to be in a lot of pain, exhibiting diffuse tenderness in the lateral portion

9



of his back musculature. Plaintiff was instructed to continue with is current pain medications, and was scheduled for physical therapy and aquatic therapy. [pp. 476-477]. By January 2003, Plaintiff had been discharged from physical therapy, with Dr. Bethea noting that Plaintiff had made "slow progress" with pain decreasing to eight on a ten point scale. (R.p. 317).

Plaintiff was seen by Dr. Kathleen Flocke on January 31, 2003 with continuing complaints of pain as well as night sweats. (R.pp. 316-317). Dr. Bethea saw Plaintiff for a followup of these complaints on February 10, 2003, at which time he was walking with a cane and exhibited some mild tenderness in the midepigastric area, but with no real right upper quadrant tenderness. (R.p. 315). A C.T. scan of Plaintiff's abdomen revealed some fatty changes in his liver with mild splenomegaly. (R.p. 328). On March 3, 2003, Plaintiff received some trigger point injections, and it was noted that he smelled of alcohol. It was also noted that Plaintiff had an elevated blood pressure that "may be related to withdrawal symptoms". (R.p. 312). As previously referenced, Plaintiff's eligibility for DIB expired on March 31, 2003.

Plaintiff began seeing a family practitioner, Dr. Tasha Boone, in September 2005. On July 5, 2006 Dr. Boone completed a multiple impairment questionnaire wherein she noted that Plaintiff had extensive back, leg and shoulder pain as a result of motor vehicle accident in October 1996 resulting in decreased mobility on the right side and decreased range of motion of all extremities. Dr. Boone opined that Plaintiff was in daily and chronic pain, and that he was disabled and unable to work. (R.pp. 643-650). Significantly, Dr. Boone further found that the symptoms and limitations stated in her assessment had been in effect since October 1996. (R.p. 649). Dr. Boone repeated this opinion of disability in questionnaires completed October 5, 2006 and August 24, 2007. (R.pp. 864-865, 935-940). On February 1, 2005, psychiatrist Dr. Aziz Mohuiddin, who had begun treating Plaintiff in October 2003, opined that Plaintiff had a mood disorder which caused work



preclusive mental limitations, and that his limitations had existed since his motor vehicle accident in 1996. (R.pp. 371-378).

After review and consideration of this medical evidence as well as Plaintiff's subjective testimony, the ALJ determined that during the period Plaintiff was eligible for DIB (through March 31, 2003) he had the residual functional capacity for sedentary work where he was only occasionally required to balance, stoop, and crouch; never climb, kneel or crawl; perform no overhead reaching with the right "dominant" arm; and avoid exposure to hazardous work settings. Due to his pain and mood disorder, Plaintiff was further restricted to simple, routine work instructions, in settings not involving large crowds in the workplace or waiting on members of the public as customers, with his work instructions to be given to him orally. (R.p. 29). Substantial evidence in the medical records support these findings through at least March 31, 2003, and the undersigned can find no reversible error in the decision of the ALJ that Plaintiff was not eligible for DIB because he failed to establish a disability before March 31, 2003.

Although Plaintiff argues in his brief that Dr. James' findings suggest that he was disabled and unable to work, the ALJ noted that Dr. James' September 2002 conclusion concerning Plaintiff's work capacity was based on the Plaintiff's own poor motivation for any work, not on his medical findings. (R.pp. 31, 484-485). The undersigned agrees with the ALJ that Dr. James' medical records otherwise provide substantial evidence for the RFC found by the ALJ for the relevant time period. The ALJ also noted that Plaintiff's primary physician, Dr. Bethea, specifically declined Plaintiff's request for a letter of disability, stating that his condition did not warrant such a conclusion; (R.pp. 33, 488); further pointing out that Plaintiff's medical records consistently reflected minimal medical findings, including x-rays consistently reflecting minimal objective findings with only conservative treatment being recommended for the Plaintiff during the relevant time period.



11

(R.pp. 30-33). Again, the cited medical records and opinions of Plaintiff's treating and consultative physicians provide ample substantial evidence to support the RFC found by the ALJ for the relevant time period. See Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance to be accorded treating physician's opinion]; Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly give significant weight to an assessment of an examining physician]; Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992)[conservative treatment not consistent with allegations of disability].

The primary medical opinions Plaintiff appears to rely on to support his argument are those of Dr. Westerkam, Dr. Boone, and Dr. Mohuiddin. However, Dr. Westerkam's statements of July 10, 2002 that Plaintiff was totally disabled and unable to work is a conclusion reserved to the Commissioner. Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]. Further, Dr. Westerkam opined that Plaintiff had been totally disabled since 1996, even though Plaintiff had already been found in earlier applications not to have been disabled through May 31, 2002 (although he had had a closed period of disability for the period immediately following his automobile accident through November 2, 1997), and does not even allege that he was disabled prior to June 1, 2002. (R.pp. 54, 243, 1013, 1019). The ALJ considered Dr. Westerkam's July 10, 2002 opinions and found them not to be supported by the clinical and diagnostic record or by the opinions of Plaintiff's other treating physicians during the relevant time period, and found his opinions not to be persuasive in evaluating Plaintiff's degree of impairment. (R.pp. 33-34). Again, the undersigned can find no reversible error in the ALJ's treatment of the opinion of Dr. Westerkam. Craig, 76 F.3d 585, 589-590 [rejection of treating physician's opinion justified where treating physician's opinion



was inconsistent with substantial evidence of record]; Burch v. Apfel, 9 Fed.Appx. 255 (4th Cir. 2001) [ALJ did not err in giving physician's opinion little weight where the physician's opinion was not consistent with her own progress notes.]; see also Ross v. Shalala, No. 94-2935, 1995 WL 76861, at * 2 (Feb. 24, 1995)[ALJ's decision upheld where the ALJ appeared to split the difference between physician's opinions]; Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Castellano, 26 F.3d at 1029 [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]; see also Orrick v Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

With respect to the opinions of Dr. Boone and Dr. Mohuiddin, the ALJ properly discounted these retrospective opinions, as they were not supported by the medical evidence from the relevant time period, they offered opinions of disability going back to periods of time where Plaintiff had already been determined not to be disabled, and they failed to provide any adequate or proper basis for crediting their findings considering that neither one of these physicians had seen or treated Plaintiff prior to March 2003. Cf. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)[ALJ properly gave treating physician's opinion less deference where it was rendered three years after the claimant's insured status expired]; Potter v. Secretary of Health and Human Servs., 905 F.2d 1346, 1348-1349 (10th Cir. 1990)[While physicians may provide retrospective diagnoses, evidence of actual disability during the insured period is required.] Plaintiff's arguments with respect to the ALJ's treatment of the treating physicians' opinions in reaching his decision are therefore without merit.



13

**Conclusion**

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. <u>Blalock</u>, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

July 27, 2010
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

